IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN THE MATTER OF:         )                   CASE NO. 13-40813
                                      )                   CHAPTER 11
D & L ENERGY, INC., *et al.*     )
                                        )
Debtors and Debtors-in-Possession   )                   JUDGE KAY WOODS
                                        )
                                        )
DEBTOR                             )

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE PRIVATE SALE OF CERTAIN DISPOSAL WELL ASSETS OF DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND (II) GRANTING RELATING RELIEF

D & L Energy, Inc., ("D&L") & Petroflow, Inc., ("Petroflow") (collectively, "Debtors"), debtors and debtors-in-possession in the above-captioned Chapter 11 cases (the "Cases"), by and through counsel, hereby respectfully move this Court (the "Private Sale Motion") for the entry of an order, (i) authorizing the private sale of certain Disposal Well Assets (defined below) of Debtors, free and clear of liens, claims, and encumbrances; (ii) waiver of the fourteen (14) day stay period under Bankruptcy Rule 6004(h); and (iii) granting related relief. In support of this Private Sale Motion, Debtors respectfully state as follows:

### JURISDICTION

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On April 16, 2013, (the "Petition Date") the Debtors commenced their Cases pursuant to Chapter 11 of the Bankruptcy Code.   The Cases are being jointly administered pursuant to an order of this Court.

4.      The Debtors are continuing in possession of their property and are operating and managing their business, as debtors-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      On April 25, 2013, The United States Trustee appointed an official committee of unsecured creditors (the "Committee").

6.      During the course of the Cases, Debtors concluded that a sale of all/substantially all of their assets and business was necessary and appropriate.  As a result, Debtors petitioned the Court and received approval to employ SS&G Parkland Consulting, LLC ("SSGP") as Debtors' investment banker to market and seek the highest and best offer in connection with a sale of their assets and business operations.

7.      On September 18, 2013, Debtors motioned the Court for orders approving a sale of substantially all of Debtors' assets and for approval of a form asset purchase agreement and bid procedures, among other things. The motion pertaining to the proposed auction procedures was set for hearing and was approved (at least in part) by virtue of the Court's order dated October 22, 2013, docket entry number 270.

8.     On November 13, 2013, the Debtors, through SSGP and with the cooperation of counsel for the official committee of unsecured creditors ("Committee Counsel"), conducted an auction of their assets in Cleveland, Ohio (the "November Auction"). The November Auction was adjourned until Saturday, November 16, 2013, at which time it was concluded. After the November Auction was concluded, the Debtors (in consultation with Committee Counsel) determined that Resource Land Holdings, LLC ("RLH") had made the highest and best bid.

9.     On November 19, 2013, the Court held a hearing regarding the proposed sale motion and sale to RLH (the "November Sale Hearing"). Debtors' proposed sale motion was conditionally approved by the Court at the November Sale Hearing subject to the Court's review of a modified asset purchase agreement which was to be provided to the Court by Debtors and RLH.

10.     On November 22, 2013, the Court entered an Order (I) Authorizing Post-Petition Secured Financing Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, and 364, and (II) Modifying The Automatic Stay (the "DIP Order"). Pursuant to the DIP Order, ITG Taxable Fund LLLP (the "Secured Party") extended post-petition credit facilities in the aggregate maximum amount of $2 million (the "DIP Loan"). The DIP Loan is secured by liens on substantially all the Debtors' assets and is entitled to superpriority administrative status under the Bankruptcy Code.

11.     On November 27, 2013, Debtors and RLH executed a final asset purchase agreement requiring RLH to purchase substantially all of Debtors' assets for a purchase price of $20,700,000.00. It also required RLH and Debtors to negotiate in good faith the terms of a separate asset purchase agreement regarding Debtors' membership interest in

the entity known as North Lima Disposal Well #4, LLC.

12.     On December 9, 2013, the Court entered an Order: (I) Authorizing the Sale of Substantially All of the Debtors' Assets, Other than Debtors' Interest in the No. 4 Disposal Well, Free and Clear of Liens, Claims, Encumbrances and Interests; and (II) Granting Related Relief, docket entry number 568 (the "December Sale Order"), which incorporated and approved the November 27, 2013 Asset Purchase Agreement (the "November APA") between Debtors and RLH.

13.     Under the terms of the November APA, RLH was afforded a period for due diligence *after* the December Sale Order was entered. The purpose of the post-November Sale Hearing due diligence was to allow RLH to more closely examine Debtors' assets to determine whether RLH wished to exclude any of the "Acquired Assets" (as that term was described in the November APA) from the closing.  Additionally, RLH was provided an opportunity to determine whether a "defect" as defined in Schedule 3.1.6 of the November APA relating to that portion of the Acquired Assets described in the Schedule existed.  In the event of a defect identified by RLH that Debtors could not cure RLH may have been entitled to a corresponding Purchase Price Reduction as set forth in Schedule 3.1.6.

14.     RLH began issuing notices of defects to the Debtors in January of 2014. These notices were made on a rolling basis and continued to be issued to Debtors throughout the due diligence period. In addition to the defect notices, RLH also issued multiple notices of material breaches of the November APA to the Debtors. The issuance of these notices of defects and material breaches resulted in significant disputes between Debtors and RLH.

4

15.     On May 30, 2014, RLH's counsel informed Debtors that RLH was terminating the November APA. That same day, RLH filed an adversary complaint wherein RLH sued Debtors for Declaratory Judgment and damages relating to the November APA (the "Adversary Proceeding").

16.     Debtors answered RLH's complaint and asserted counterclaims against RLH. The Committee intervened in the Adversary Proceeding asserting its own counterclaims against RLH, and has generally participated as a party to that case. Currently, the Adversary Proceeding is still pending and is in its discovery phase.

17.     Contemporaneous with the filing of this Private Sale Motion, Debtors have filed: (i) a Joint Motion to Compromise with RLH in which Debtors and RLH seek to resolve all of the claims asserted in the Adversary Proceeding (the "Motion to Compromise"), and (ii) a Sale & Procedures Motion seeking a separate sale of all of the Debtors' remaining assets at a public auction (the "Public Sale Motion").

## RELIEF REQUESTED

18.     By this Motion, the Debtors seek the entry of an order (i) authorizing the sale of certain assets of Debtors, free and clear of liens, claims, and encumbrances; (ii) waiver of the fourteen (14) day stay period under Bankruptcy Rule 6004(h); and (iii) granting related relief.

## DESCRIPTION OF THE PROPOSED SALE

**A.      The Proposed Sale**

19.     The Debtors propose to sell certain assets of Debtors to Purchaser (the "Private Sale") pursuant to the terms of an asset purchase agreement between Debtors and

Purchaser that is attached hereto as Exhibit A (the "Agreement"). The salient terms of the

Agreement are as follows:[1]

(a) **Assets to Be Sold**. All of the following assets, wherever they may be located at the time of the Closing, described as follows (collectively, the "Sale Assets"):

(1) All of the Debtors' transferrable membership interest in and to North Lima Disposal Well #4, LLC (hereinafter "North Lima #4" shall refer to the limited liability company and "North Lima #4 Units" shall refer to Debtors' membership interest in the North Lima #4), or so much of the Debtors' right, title and interest in the North Lima #4 Units that remains after the company or its other members exercise their rights of first refusal under the company's operating agreement;

(2) Debtors' 100% ownership interest in Northstar Disposal Services II, LLC (hereinafter "Northstar #2" shall refer to the limited liability company and "Northstar #2 Units" shall refer to the membership interest to be transferred by Debtors to RLH pursuant to the Agreement));

(3) Debtors' 100% ownership interest in Northstar Disposal Services VI, LLC (hereinafter "Northstar #6" shall refer to the limited liability company and "Northstar #6 Units" shall refer to the membership interest to be transferred by Debtors to RLH pursuant to the Agreement) and the lease associated with the Northstar #6;

(4) The following accounts receivable owed to Debtors by North Lima #4 (collectively the "Debtor Entities North Lima #4 Receivables")

(i) A receivable owed to D&L Energy, Inc. in the amount of $339,341.07.
(ii) A second receivable owed to Petroflow, Inc. in the amount of $55,488.35;

(5) the account receivables owed to North Lima #4 by Northstar #2 in the amount of $313,655.00 (the "Northstar #2 Receivable");

---

[1] The Agreement itself should be referred to in its entirety for the specific terms and conditions thereof. If there is any inconsistency between the following summary and the Agreement, the terms and conditions of the Agreement will control. Capitalized terms used, but not defined in the following summary, have the meanings ascribed to such terms in the Agreement.

13-40813-kw    Doc 834    FILED 09/09/14    ENTERED 09/09/14 21:41:42    Page 6 of 22

(6) Debtors rights to prosecute the administrative appeal of the permit revocations of salt water disposal permits API Permit # 3409923158000: API Permit # 34099231710000 and API Permit # 34155240430000 and all of Debtors' rights, title and interest in and to materials that the attorney-client privilege and the work product protections protect from disclosure insofar as those materials pertain to the permit revocations and the appeal. To the extent that RLH chooses to pursue this litigation, it will be done so at the sole expense of RLH, with no further cost or obligation on the part of Debtors;

(7) Copies of all information in the Debtors' possession, custody or control pertaining to the Sale Assets, including, but not limited to, documents and/or records pertaining to: (i) the creation, use and operation of the Sale Assets; (ii) the Debtors' Business as it relates to the North Lima #4 and the North Lima #4 Units; and, where in possession of the Debtors (iii) the books and records, and databases and/or operating data (if applicable) relating to North Lima #4, Northstar #2 and Northstar #6's construction, use and operation of the entity's properties and assets, including, but not limited to, the disposal wells associated with the North Lima #4, the Northstar #2 and the Northstar #6 ("Operating Information"); and

(8) Any uncollected or future revenues derived from, arising out of the ownership or operation of, or related in any way to the Sale Assets;

(b) **Excluded Assets.** All of the Debtors' assets that are to be sold at an auction sale for which RLH has separately agreed to participate as a "stalking horse" bidder as detailed in the Public Sale Motion are excluded from the Private Sale. Moreover, and without limitation, the Private Sale will exclude the lease that is associated with Northstar Disposal Services II, LLC's operations (the "Northstar #2 Lease) and a trade credit in the amount of Nineteen Thousand One Hundred Twenty-Five and Seventy-Five Cents ($19,125.75) that D&L Energy, Inc. owns and holds against North Lima #4 (the "D&L North Lima #4 Trade Credit").

(c) **Assumed Liabilities; Excluded Liabilities**. RLH will assume only those liabilities arising out of its ownership or use of the Sale Assets after the transaction closes.

(d) **Purchase Price**. The purchase price for the Sale Assets shall be Four Million Three Hundred and Fifty Thousand Dollars ($4,350,000.00), subject to a proportionate reduction of the purchase price amount based on the North Lima #4 entity or the members of

7

North Lima #4 exercising their rights of first refusal as permitted by the operating agreement governing the North Lima #4 as amended and restated (the "North Lima #4 Operating Agreement"). By way of example, if the North Lima #4 entity elects to purchase all of the Debtors' membership interest at the exercise price of $4,000,000.00, RLH will only be obligated to pay $350,000.00 for the remaining assets to be sold in the Private Sale. By way of further example, if the North Lima #4 entity does not elect to exercise its right of first refusal, but if North Lima #4 members elect to purchase 25% of Debtors' membership interest in North Lima #4 pursuant to their rights of first refusal, the $4,350.000.00 sale price will be reduced by $1,000,000, requiring RLH to pay $3,350,000.00 for the balance of the Debtors' membership interest and the remaining assets to be sold in the Private Sale.

(e) **Closing**. The closing shall take place no later than ten (10) days after the later to occur of (i) the Court's entry of the Sale Order, or (ii) the waiver and/or exercise of the rights of first refusal by the North Lima #4 entity and its members (the "Closing Date").

## B. The Private Sale Hearing, Notice & Right of First Refusal

20. The Debtors seek to have a hearing to consider approval of the Private Sale at the Court's earliest convenience (the "Private Sale Hearing").

21. As noted above, sale of the North Lima #4 units are subject to the other North Lima members' rights of first refusal, which are outlined in North Lima #4 Operating Agreement., On August 25, 2014 the Debtors called a special meeting of the members of North Lima #4 and made an offer to sell to the company and its members that is sufficient under the terms of the North Lima #4 Operating Agreement to trigger their rights of first refusal. Additionally, on August 25, 2014 RLH made an offer to the North Lima #4 entity and its members to induce them to waive their rights of first refusal under the North Lima #4 Operating Agreement. RLH has contractually committed that it will continue its good faith and best efforts to negotiate waivers of those rights of first refusal.

8

## BASIS FOR RELIEF

**A.** **The Sale is Within the Debtors' Sound Business Judgment and Should be Approved Pursuant to Section 363 of the Bankruptcy Code.**

22.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Debtors respectfully submit that ample authority exists for the approval of the proposed sale of the Assets pursuant to section 363 of the Bankruptcy Code with all possible swiftness.

23.     In determining whether to authorize such use, sale or lease of property outside the ordinary course of business and outside of any chapter 11 plan pursuant to section 363(b), Debtors must show that a sound business purpose justifies such actions. In fact, the Sixth Circuit has concluded that "a bankruptcy court can authorize a sale of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action" prior to confirmation of a plan of reorganization. *See Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 389-90 (6th Cir. 1986); *see also In re Lionel Corp.* 722 F.2d 1063, 1070 (2d Cir. 1983). The issue directly before the *Lionel* court was "to what extent chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." *In re Lionel Corp.*, 722 F.2d at 1066.

24.     The *Lionel* test requires a debtor to establish, as a threshold matter, a "sound business reason" justifying the pre-confirmation sale of assets. The *Lionel* court held that, when addressing a motion pursuant to Bankruptcy Code section 363(b), a bankruptcy judge should consider all salient factors and the business justifications for a debtor to sell assets pursuant to Bankruptcy Code section 363(b). *Id.* at 1071.

9

25.     To demonstrate a sound business purpose warranting a sale, courts within the Sixth Circuit and in other jurisdictions have developed a four-part test requiring a debtor to demonstrate: (1) a sound business reason; (2) accurate and reasonable notice; (3) an adequate price; and (4) good faith. *See In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994); *In re Titusville Country Club,* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (sale of substantially all of the assets was justified where the debtor could show a sound business reason, accurate and reasonable notice, adequate price and good faith); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

26.     Debtors submit that there is ample justification for the proposed sale of the Sale Assets to the Purchaser pursuant to Bankruptcy Code sections 105, 363 and 365.

27.     First, the proposed Private Sale is a necessary and vital component of the Settlement Agreement which Debtors and Purchaser executed and attached to the Motion to Compromise filed contemporaneously with this Private Sale Motion.  The proposed Private Sale will allow Debtors to expeditiously and efficiently resolve the complex litigation between the Debtors, the Committee and RLH, and will in turn substantially reduce administrative costs to the estate.

28.     Second, notice of the Private Sale Motion and the Private Sale is appropriate under the circumstances. Under Bankruptcy Rules 2002(a) and (c)(1), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the terms and conditions of any private sale, and the deadline for filing any objections

to such sale. This Motion, and the notice hereof, fully complies with Bankruptcy Rule 2002 and is reasonably calculated to provide timely and adequate notice of the terms and conditions of the Private Sale to the Debtors' creditors and other parties in interest, as well as to those parties who have expressed an interest, or may express an interest, in making a bid to purchase the Sale Assets. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel for the DIP Lender; (iv) all entities known to have expressed an interest in a transaction with respect to the Sale Assets; (v) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Sale Assets; (vi) all non-Debtor counterparties to any executory contract or unexpired lease that may be assumed and assigned to Purchaser; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Sale Motion; (viii) all known creditors of the Debtors; (ix) those parties listed on the Debtors' Creditor Matrix; and (x) those parties who have filed a notice of appearance and request for service of pleadings in these Chapter 11 Case s pursuant to Bankruptcy Rule 2002.

29.     Third, the Debtors submit that the Private Sale is for a fair and reasonable price.  The Debtors have been extensively engaged in pursuing a sale of their interests in the saltwater injection/disposal wells since March 2013.  After the filing of the Cases, Debtors retained SSGP to market Debtors' Assets to potential buyers and SS&G received interest as a result of their marketing efforts which culminated in the November Auction and the proposed sale of substantially all of Debtors' assets to RLH. Since Debtors learned of RLH's termination of the RLH APA at the end of May, 2014, Debtors requested that

SSGP actively market Debtors' assets in order to re-auction the same. To date SSGP has taken the following actions in marketing Debtors' assets for a new auction sale:

- On July 3, 2014, mailed a Teaser & Confidentiality Agreement to 2,498 parties who could have an interest in Debtors' assets, including:
    - -2,017 strategic buyers,
    - -342 lawyers specializing in oil & gas with practices in the area,
    - -139 financial parties who have or desire investments in oil & gas exploration;
- Emailed and/or mailed Teaser and Confidentiality Agreements to additional parties as SSGP became aware of the same;
- Ran advertisements beginning July 22, 2014, in various Dow Jones Publications as follows:
    - -4 consecutive days in the Wall Street Journal national edition,
    - -3 days in the Wall Street Journal European Edition,
    - -3 days in the Wall Street Journal Asia Edition,
    - -1 week in Barron's,
    - -30 days on the Wall Street Journal Small Business opportunity website;
- Made hundreds of follow-up calls (over 800 to date) to parties who have not yet signed & returned Confidentiality Agreements but who have expressed interest in Debtors' assets;
- Actively monitored the activity of interested party as they review the information in the Virtual Data Room to ensure that the interested parties have sufficient access and have ample opportunity to evaluate the opportunity of acquiring Debtors' assets;
- Directly contacted and worked with every interested party to ensure they have the all necessary information in order to make an informed decision regarding the possible acquisition of Debtors' assets.

To date, SSGP has received 38 signed Confidentiality Agreements (both foreign and domestic in origination), and all who have signed said agreements have been given access to the Virtual Data Room, and has responded to numerous requests for additional information by interested parties as they performed their due diligence. Based on the extensive marketing efforts conducted by the Debtors' advisors, the input received from SSGP based on its extensive efforts to market the Sale Assets, and considering the additional benefit as set forth in the Joint Motion to Compromise, the Debtors submit that the Purchase Price is fair and reasonable.

12

30.     Debtors believe that all of the following factors adversely affect the marketability of the Sale Assets:

o   Debtors' North Lima #4 Units are difficult to market through a public sale auction because the North Lima #4 Operating Agreement includes transfer restrictions that adversely affect their marketability.

o   The North Lima #4 Units are subject to rights of first refusal that may be exercised by either the company or its other members.  Although the company must exercise its rights of first refusal, if at all, to purchase all of Debtors' interests, if the company declines to purchase Debtors' interest (which is likely because the company's lack of operating capital), any of its members may exercise a right of first refusal to buy a share of Debtors' interest that is in proportion to the interest that the member holds.  This could result in members purchasing only a portion of Debtors' North Lima #4 Units, leaving Debtor with some interest that is less than what a public auction bidder offered to purchase.  This is significant because Debtors current hold a majority interest in North Lima #4, but member-exercised rights of first refusal could reduce Debtors' interest below a majority.  An auction bidder would likely bid on the North Lima #4 Units based on Debtors' majority ownership and the exercise of rights of first refusal reducing the interest below majority ownership would likely affect the bidder's desire to purchase the North Lima #4 Units, or at least the price at which the bidder is willing to purchase the remainder of Debtors' interest. The design of the Private Sale asset purchase agreement avoids this

complication. RLH has agreed to purchase Debtors' interest that remains after North Lima #4 or its members exercise their rights of first refusal, subject only to a pro rata price reduction for any of Debtors' membership interest which RLH is not able to acquire as a result of the exercise of any right of first refusal. Despite RLH's commitment to purchase any/all of Debtors' membership interest remaining at a set per unit price, RLH shall have no obligation or duty to pay for any of Debtors' membership interest which RLH does not acquire as a result of the exercise of any right of first refusal.

o There are also potential interpretations of the North Lima Operating Agreement which could lead to arguments that other restrictions apply to the transfer of Debtors' interest in the North Lima Entity. Debtors and RLH have discussed these interpretations/restrictions/risks at length and RLH has agreed to purchase and accept Debtors' interests, as is, and with all of those potential risks. To this end, RLH is working with the other North Lima Entity members to overcome any transfer restrictions, and has not made the exercise of those transfer restrictions a condition to completing its purchase responsibility.

o North Lima #4, Northstar #2 and Northstar #6 are not operating entities, have never operated, and, in fact, all of the entities have had their respective permits revoked. Moreover, payment of the Northstar #2 Receivable and the Debtor Entities North Lima #4 Receivables included in

the Sale Assets are dependent upon North Lima #4 commencing operations in the future.

o Northstar #6 and Northstar #2 are subject to a high level of regulatory scrutiny because they are located in close proximity to a saltwater injection well whose operations the Ohio Department of Natural Resources ("**ODNR**") suspended for allegedly causing seismic activity.

31.     Finally, the Debtors believe the Private Sale satisfies the good faith requirement of the four-prong test.  There is no evidence of fraud or collusion in the terms of the proposed Sale. The Agreement is the culmination of a negotiation process in which all parties were represented by counsel. The Purchaser is not an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have and will continue to be conducted on an arms-length, good faith basis. Furthermore, the Sale is subject to objections by third parties. Finally, all parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard.

32.     As each factor demonstrates, the Private Sale satisfies the "sound business judgment" test and presents the best opportunity to realize the maximum value of the Sale Assets for the benefit of creditors and other parties in interest. Furthermore, the Private Sale will allow the Debtors to reduce their and other liabilities related to the Adversary Proceeding and plugging obligations, for the benefit of their estates, creditors and all parties in interest. For the foregoing reasons, the Debtors submit that the Private Sale should be approved pursuant to section 363 of the Bankruptcy Code.

## B. An Auction of the Sale Assets Is Not Required.

33. In accordance with Bankruptcy Rule 6004(f)(1), asset sales outside of the ordinary course of business may be by private or public sale. Fed. R. Bankr. P. 6004(f)(1). A debtor has broad discretion in determining the manner in which its assets are sold. *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . ."); *In re Bakalis,* 220 B.R. 525, 531 (Bankr. E.D.N.Y.1998) (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property.") (internal quotations and citations omitted). As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment of how to conduct a sale of its assets. *Id.* at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re Nepsco, Inc.,* 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). Accordingly, if a debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interest of the estate, the debtor should be permitted to do so. *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

34. The Debtors are unaware of any other parties that would submit a higher offer than that of Purchaser. The major asset of the proposed Private Sale, Debtors' interest

16

in the North Lima Entity, is subject to a contractual right of first refusal which does not lend itself to a public auction setting. Further, Debtors have not received any offer for the Sale Assets which satisfies the rights of first refusal associated with the Sale Assets. As previously discussed, the proposed Sale is an integral part of the compromise which Debtors reached with RLH and the Committee to resolve the Adversary Proceeding. Accordingly, the Debtors submit that a private sale of the Sale Assets, subject to the receipt of any objections before or at the Private Sale Hearing, is appropriate under the circumstances, is in the best interest of the Debtors' estates and should be approved.

35.     Finally, the Debtors believe that the rights of first refusal held by the North Lima #4 entity and its members will permit a market test of the major asset to be sold pursuant to the Private Sale – the North Lima #4 Units. To date neither the company nor any of its members has indicated that they wish to exercise their rights of first refusal at the price established by RLH in connection with the Private Sale.

C.      **A Sale Free and Clear of Liens, Claims and Encumbrances Is Authorized by Section 363(f) of the Bankruptcy Code.**

36.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, encumbrances and interests in such property if,

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

17

        (5)      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793-96 (Bankr. D. Del. 2002) (section 363(f) is written in the disjunctive; the court approved the sale "free and clear" where only one of the five subsections of section 363(f) were met).

37.     The sale contemplated by this Motion satisfies these requirements. The Purchase Price for the Sale Assets substantially exceeds the known secured liabilities of the Debtors, and as such, the sale of the same will result in proceeds in excess of the aggregate value of all liens on the Sale Assets – thus satisfying section 363(f)(3) with respect to all such liens. Section 363(f)(5) is also satisfied with respect to all other liens, claims, encumbrances or security interests asserted against the Assets, as the liens are capable of being satisfied by money, and will attach to the proceeds of the sale in the same order of priority that existed on the petition date.

38.     Here, the Secured Party, which hold liens on substantially all of the Debtors' assets, has consented to the sale of the Sale Assets, free and clear of encumbrances, subject to the proceeds of the Sale being paid to the DIP Lender in accordance with the terms of the DIP Order. Accordingly, section 363(f) of the Bankruptcy Code has been satisfied and the Debtors may sell the Sale Assets free and clear of all encumbrances. See 11 U.S.C. § 363(f)(2).

39.     Other than the lien of the Secured Party, the Debtors are not aware of any other encumbrances on the Sale Assets. If any such encumbrance on the Sale Assets should exist, the Debtors submit that such encumbrance is subject to one or more of the provisions of section 363(f) of the Bankruptcy Code.

40. Further, any creditor that asserts an interest in the Debtors' assets that receives notice of the Sale and does not file an objection thereto should be deemed to have implicitly consented to the Private Sale free and clear of such interest. *See Hargrove v. Pemberton (In re Tabore, Inc.)*, 175 B.R. 855 (Bankr. D.N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of section 363 of the Bankruptcy Code). Therefore, either expressly or implicitly, the requirements of section 363(f)(2) of the Bankruptcy Code for the Sale of the Purchased Assets free and clear of interests will be satisfied.

41. Accordingly, the Debtors submit that the Private Sale free and clear of all encumbrances (including any successor liability claims) under section 363(f) of the Bankruptcy Code should be approved.

**D.     Good Faith Pursuant to Section 363(m).**

42. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. section 363(m). While the Bankruptcy Code does not define "good faith," the Seventh Circuit in *In re Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986), held that:

> The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

798 F.2d at 1125 (emphasis omitted) ((*quoting In re Rock Industries Machinery Corn.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m)).  The Debtors submit, and will present evidence at the Private Sale Hearing, if necessary, that as set forth above, the Agreement was negotiated at arms-length and the Purchaser has acted in good faith. The Debtors therefore request that the Court make a finding that Purchaser has purchased the Sale Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**E.      Relief from the 14-Day Stay Under Bankruptcy Rule 6004(h) is Appropriate.**

43.      Pursuant to Bankruptcy Rules 6004(h) and 6006(d), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code and the assumption and assignment of executory contracts pursuant to section 365 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h) and 6006(d). The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed R. Bankr. P. 6004(h) and 6006(d).

44.      Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, *Collier on Bankruptcy* suggests that the fourteen-day period should be eliminated to allow the sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 6004.09. Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled,

and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

45.     Here there is an additional compelling reason to provide relief from the stay for which the Bankruptcy Rules provide.   The North Lima #4 Operating Agreement requires that if the company and the members have not elected to purchase all of the North Lima #4 Units in connection with their rights of first refusal, Debtors and RLH have only 30 days to complete the transaction or the North Lima #4 Units will again become subject to the same restrictions.   The 45-day period for the exercise of rights of first refusal was triggered on August 25, 2014.   Accordingly, unless the company or all of the members waive this right earlier, the transaction will have to be closed by November 8, 2014.

46.   The Debtors request that the Bankruptcy Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## CONCLUSION

**WHEREFORE**, Debtors respectfully request that this Court enter an order: (i) authorizing the sale of certain assets of Debtors, free and clear of liens, claims, and encumbrances; (ii) waiver of the fourteen (14) day stay period under Bankruptcy Rule 6004(h); and (iii) granting related relief.

Dated: September 9, 2014.                    Respectfully submitted,

                                             Roderick Linton Belfance LLP

                                             /s/ Lawrence R. Bach
                                             KATHYRN A. BELFANCE (0018035)
                                             LAWRENCE R. BACH (0021205)
                                             TODD A. MAZZOLA (0062160)
                                             BRIAN T. ANGELONI (0083651)
                                             STEVEN J. HEIMBERGER (0084618)
                                             50 South Main Street, 10th Floor
                                             Akron, Ohio 44308
                                             (330) 434-3000
                                             (330) 434-9220 (fax)
                                             kb@rlbllp.com
                                             tmazzola@rlbllp.com
                                             bangeloni@rlbllp.com
                                             sheimberger@rlbllp.com
                                             *Counsel for Debtors and Debtors in Possession*